Thank you and good morning. May it please the court, my name is Brian Knudson. I'm here on behalf of plaintiffs below and appellants here. With the court's permission, I'd like to reserve four minutes for rebuttal and I'll keep an eye on my clock here. The Elwha River restoration project is the largest salmon restoration project ever undertaken in the United States. The scale of this dam removal is unprecedented. The project has been mandated by active Congress directing the full restoration of the Elwha River ecosystem and its native fisheries. It's being undertaken at an enormous taxpayer expense. This project and all of its significant components warrant the thorough evaluations and opportunities for public participation mandated by law. That did not and has not occurred with respect to the plan to flood the Elwha River with seven and a half million hatchery fish a year in a supposed effort to restore native self-sustaining wild fish populations. There's a whole series of procedural steps and other things that occurred in this case and I need to have straight in my mind what happened or what the district judge said with respect to your NEPA claims that you're challenging only the plan and the plan is not a final action and therefore I dismiss your NEPA claims. Fair summary of what? That's a fair summary of the way Judge Settle handled the claims against the Department of Interior. Right, against the Department of Interior, I'm sorry. Okay, let's assume for a Let's assume that the plan is not a final agency action, but you had, but you say you had claims directed at other agency actions. What are you talking about with respect to the Department of Interior? With the Department of Interior, we're focusing on DOI right now. Correct, with the Department of Interior we had claims irrespective of whether or not the fish restoration plan was itself a final agency action. It was clear that the agency was funding and implementing. I read your complaint and it's not very specific about what those actions are. What are the actions that subsequent to the plan by the Department of Interior you think required NEPA compliance? Right, well certainly the funding contracts where the Department of, the Secretary of Interior entered into contracts under which it determined to fund the hatchery programs at issue here. Okay, so let me, thank you, because I want to sort of walk through what happened here. Is the funding of the hatcheries, does that in and of itself have any effect whatsoever on the river? I'm sorry, on the river? Yeah, in other words, as I understand, the funding allowed the hatcheries to grow the fish. Correct. Does growing the fish itself have any negative impact on the river? I'm not sure how to answer that. Certainly there's effluent discharge from the hatchery that would That's not what you're charging here. No, our concerns are in relation to the actual release. The actual release, right. So let's assume for a second that it's really the actual release. That's the decision that you're challenging. Correct. With respect to the actual release, what does the eventual two sets of EAs issued by the NMFIS and the biological opinions and the taking, what does that do to your NEPA claim, if anything? With respect to the Department of Interior? Department of Interior. Sure, well, it's our position that the hatchery, well, NEPA applies to actions funded or authorized by federal agencies, and here the hatchery programs are funded by the Department of Interior, and so it has an obligation to comply with NEPA. Certainly the Department of Interior participated in the environmental assessment that was prepared by NOAA Fisheries, or NEMPS, and so to the extent that that NEPA document was sufficient and actually took a hard look at the hatchery programs at issue and alternatives to those hatchery programs, the Department of Interior would have satisfied its NEPA obligations. So if we find that the EA, there's actually two EAs, but the EA issued by, I call it NEMPS, but by NEMPS was a hard look, does it suffice in your view to be the Department's hard look? That's correct. The NEPA regulations encourage agencies to avoid duplicative paperwork and to work together to prepare NEPA documents, and so certainly the Department of, and I believe the EA that NOAA issued for its Endangered Species Act approval explicitly encompassed as one of the actions the Department of Interior's funding. Can I move backward a second now, because I'm not sure when fish first started being released pursuant to the Department's plan. There's plenty of evidence that the tribe had been releasing fish well before this So again, the NEPA applies to any agency action that's funded or authorized by an agency, and so the Department of Interior has, as far back as I know, and certainly predating the statute of limitations period, been funding the hatchery program. No, but that's not what I asked, because I asked you before, in my mind at least, maybe I'm compartmentalizing it too much, no harm occurred to the river from the funding of the hatcheries. The harm that occurred to the river and to the salmon was putting these fish in. And so my question is, when were the fish first put into the river pursuant to funding and plans developed by the Department? Well, first of all, we would say that these hatchery programs have been harming... No, I understand. I'm asking you to accept my premise. I'm asking a factual question. Sure. So the final fish restoration plan was published in 2008 and described the hatchery strategies that... And dam removal began in 2011. So if you want to, if you're asking factually when the restoration plans, the fish restoration plan went into place, you could say it was in 2011, but it actually, when the dam removal began, but in some ways predated that. So let me ask a question, if I may. No, it's on something slightly different. There was an original, very old EA from the 1990s, I think. Correct? There were two environmental impact statements from the 90s. So there was an EIS in the 90s. But I guess my question is, were the fish at issue listed at that time or not? There were no... The first environmental impact statement was issued in 1995, and then there was a second one in 1996, and there were no listed species at that time. There was a supplement to the second EIS prepared in 2005, specifically to address the fact that Chinook salmon were listed in 1999. Okay, so... And then steelhead... I'm sorry to interrupt you. And then steelhead were subsequently listed in 2007. And so was there a follow-on analysis done after the second listing that took account of that listing? There was no subsequent environmental impact statement done, or any NEPA document prepared by the Department of... That's not true. I think that in relation to this litigation, eventually, I believe the Department of Interior prepared some sort of tag-along document to NOAA Fisheries environmental assessment and FONSI that it did here. But there was no supplemental EIS prepared in relation to the listing of steelhead. Is that tag-along document in the record in this case? I believe it is. It was simply a document saying that we concur... ...an environmental impact statement. So would that... Let me just finish. So is it your position that there had to be a different supplemental analysis done on account of the new circumstance of the listing of both kinds of fish? With respect to the Department of Interior, we have argued that there is a need for a supplemental environmental impact statement, because the Department of the Interior is the agency that's actually prepared environmental impacts that can be supplemented. And we describe various changes in circumstances that warrant a supplemental EIS, including the listing of steelhead, including changes in the hatchery programs that are actually being implemented, and certainly significant advancements in the scientific understanding of the genetic effects. But at a minimum, there's a statement in the Dombek case that when there's a new listing of a sensitive species that constitutes a changed circumstance that requires a supplemental analysis. Is that your position, or am I putting words in your mouth? I apologize. I'm not familiar with the facts of Dombek. I don't recall if that was a NEPA case or an Endangered Species Act case. I don't have that at my fingertips. I don't either. But I want to focus, I'd like to focus on our position that regardless of the Department, and we certainly think that because the original NEPA documents prepared by the Department of Interior didn't actually take a hard look at the hatchery programs being implemented, certainly NOAA Fisheries, when it took significant actions in 2012, was required to comply with NEPA when it approved funding of these hatchery programs under Section 7 of the Endangered Species Act, and it approved these programs under Section 9 of the Endangered Species Act. But it did take action, and so tell me why the action that it took violated the act. So it's required to comply, it's an authorization that's subject to NEPA. It authorizes activities that will have a significant effect on the environment. Are we talking about the Fish Restoration Plan? Am I understanding you correctly? I'm getting lost with all these documents floating around. There's a long procedural issue. So as I understand, you're challenging the Fish Restoration Plan, and are you also challenging the funding, or is the funding wrapped up in the EA and FONSI? I heard you say that. So the Fish Restoration Plan allegations relate to the Department of Interior, and we allege that the Fish Restoration Plan, when it was published in 2008, was a final agency action. We also allege that the funding and implementation of that program was an agency action that requires NEPA compliance. And so when we get to the EA, so you agree that the EA, the FONSI, and the biological opinion, they expressly say this also addresses funding. So is your argument that the EA was insufficient, that there had to be an EIS that would address the Fish Restoration Program, the funding, and everything else? Am I understanding that? Well, that's correct. So NOAA's or NIMS' approval of the hatchery programs is a new authorization. It's a new final agency action. And nobody contests that. So the question is whether there was sufficient compliance with NEPA and the ESA. We're just trying to focus that. We're looking at whether the EA was sufficient. And if we conclude that an EIS should have been developed, that addresses all of these issues, the Fish Restoration Plan, the funding, and all. If we think that the EA was sufficient, then we would say all of those issues go away because the EA was sufficient, as modified after the district court's ruling on the one point. Right. I think that's generally right. Okay, great. That's very helpful. I want to make clear here that NOAA Fisheries, it sort of took this position that it doesn't need to take a hard look at these hatchery programs by pointing to older agency decisions in NEPA documents. And so it pointed to the 1996 implementation EIS prepared by the Department of Interior. But that document itself didn't take a hard look or really any look at these hatchery programs. Because the fish weren't listed at a minimum. That's certainly part of it. But the agency is required to look at impacts to wildlife regardless of whether they're endangered under NEPA requirements. So the 2012 documents took the position that there was a baseline that included a lot of the activities, the hatchery activities and the like. Are you saying that it could not rely on that as the baseline? Well, that's exactly right. And so this issue was addressed in the Pitt River Tribe versus United States Forest Service case where the plaintiffs did not challenge a 1988 lease in the NEPA documents associated with that. They were outside the statute of limitations. Instead, they challenged an extension 10 years later in 1998 of that lease. And the court noted that generally if there's a comprehensive programmatic environmental impact statement it obviates the need to prepare a new environmental impact statement on project-specific or site-specific agency actions. But the court noted that there the older environmental impact statement didn't act and there's actually two EAs there too. It said that none of them actually took a hard look at the impacts of the effects of leasing and that here the lease extensions were new authorizations that extended legal rights that were subject to NEPA and therefore an environmental impact statement was required. I want to ask you a question about the EAs just so that I'm clear about what the district court did. There are two EAs here issued by NOAA. I think there was one EA and then maybe a supplement to the environmental to address his order on rebate. Right. And my question was as to the supplement. I call it the second one. Did the court address the sufficiency of that? In other words, the court made a ruling that there were some difficulties with the first EA if you think there's two. And then when the second one was issued, the court said, well, that solves the problem as to the tribe. But it moots the claims against the tribe. But did the court make a substantive evaluation of the second EA in your view? The court did not make any substantive evaluation. Are you challenging that? In other words, are you challenging that that went independent of the first one? We're not. And my recollection, and I need to look at the docket on this, but my recollection is that the supplement may have been issued after the matter had already been appealed and was before this court. That's right. That's what I'm trying to figure out. I'm trying to figure out what we do with the second one since the district court never saw it. Do you have a – have you challenged brought a legal action against the supplement as being insufficient? We haven't. Our position is that here the supplement – well, our challenge is that the claim that there has – that there should be an environmental impact statement because there are significant impacts isn't mooted. Wasn't affected. Yeah, the district court found one little error. They fixed the – they purport to fix the error. And you're saying that's just a fly spec. The whole project is wrong. It should have been an EIS. Am I understanding that correctly? That's correct. I take issue with the little error. The court did find that under this court's standard for vocature under the APA that it was significant enough to warrant vocature. I had a question on a different matter, if I could. What is it that the tribal defendants have to do in order to comply with the resource management plan? Give me just like 25 words or less. How would we know whether or not they are in compliance? Well, sure. So the hatchery and genetic management plans are a plan describing the way the hatcheries will be operated. They're submitted to NOAA Fisheries. NOAA Fisheries approves them under a regulation issued under the 4D rule. It describes the legal effect of its approval at 50 CFR 223.203C. It says that it's an affirmative defense that must be raised, pleaded and proved. I understand that. But you're getting finally to the place where I was trying to pinpoint, which is pleaded and proved. What is it that would have to be proved? How would we know whether there's compliance or not? So this is at excerpts of the record 264 to 65. NOAA issued what we've termed a limit six approval to authorize the hatchery and genetic management plans. And it describes extensive implementation terms defining what must be complied with in order to enjoy exemption from liability. So that would be a factually intensive look. It would be. And those terms and conditions were not even mentioned in any of the materials submitted by the hatchery operators with their motion to dismiss. They actually submitted nothing with their motion at all. So it's not as if there had been a limitation. You can't take salmon except under the following conditions and then that's removed. So you can take any salmon you want in which case you don't have to know any facts. It seems to me this is kind of the opposite of that, that in order to determine whether there's compliance you would have to have an evidentiary hearing of some kind. Or if there's even undisputed declarations submitted with their motion demonstrating that they were in compliance with the implementation terms but they weren't even mentioned. Well, I understood what the district court was saying and maybe I'm wrong about this, was that your contention with respect to the tribe was that there wasn't a valid plan in effect for the various reasons that you argue in your brief. And therefore they were taking against the law because there should have been a plan. Did you also, is there any argument that once a plan was put into place, and let's assume for a second it's valid, that they departed from it? Is there any evidence of it? No. Claim, your claim, he's asking about. Or was your claim just that they needed to have approval of an HGMB for the program? Are you claiming it didn't comply with the plan that was implemented or are you just saying because there's no valid plan that they weren't in compliance? So first of all, again, these are affirmative defense. No, I understand. I just want to know what your claim is. But we in fact did. This was all happening quick because, again, these hatchery programs were implemented as the dam was coming down and our clients were very concerned about the imminent impacts they would have. So this was all happening fast. But we did in fact supplement our pleadings immediately after these plans were issued in order to allege noncompliance. So to get back to Judge Graber's question, you're alleging that they're not operating in compliance with the plans? Yes, that is alleged in our... And that issue was never addressed below in part because the plans kept shifting and in part because your other argument was the plans didn't apply at all because they weren't valid. Well, the trial court found that they had established that they were in compliance, but the only materials they submitted was one declaration with their reply brief that stated in one sentence that they were operating their hatcheries in compliance with the hatchery and genetic management plan, which again describes the way in which the hatchery is operated, but it doesn't describe the implementation terms actually imposed by NOAA that are obligatory if the agency wants to be exempt from liability. We've asked a lot of questions, so you may have two minutes for rebuttal when the time comes. We'll hear from the defendants. Good morning. My name is Kevin McArdle. I represent the federal appellees in this case. With me at counsel's table is Chris Fontecchio of the National Oceanic and Atmospheric Administration. Also represented here today is the Lower Elwha-Klallam Tribe represented by Mr. Albright, and we'll be splitting our time with Mr. Albright, taking five minutes and focusing, with the Court's permission, on the claim against the tribe that you finished up with, although I'm happy to answer questions about that as well. To start with the first issue that the Court focused on and to simplify the NEPA claims against DOI as the Court eventually got to, I think, and just to confirm that, the challenge to Department of Interior sub-agency NEPA compliance is subsumed by the challenge to the National Marine Fisheries Service's 2012 environmental assessment for two reasons. One, the EA, the environmental assessment, covered DOI sub-agency funding, and two, the DOI sub-agencies that issue the National Park Service and the Bureau of Indian Affairs participated in the preparation of that EA as cooperating agencies. This is an argument that the District Court never had an opportunity to consider, correct? No, I don't think that's correct. Well, the District Court said you don't have a NEPA claim because you're not challenging a final action. The District Court did, to be fair, consider the validity of NOAA's compliance later on down the road, but the District Court never said, never had an opportunity to say, it doesn't matter because even if you are challenging final agency action, all of your claims are subsumed in the eventual NOAA EAs. Is that a fair statement? You are correct, Your Honor, but the legal effect... No, I understand your argument. We should find that. We're not reviewing a District Court finding on that one, are we? On that, and just to confirm why you can review it in addition to the fact that it's already been briefed up is because it renders the NEPA claim moot. Right, but my concern is this, and maybe you've answered it. I think the District Court was wrong in finding there was nothing for these guys to challenge. In other words, perhaps the plan wasn't a final action, but at some point after the plan, there must have been a final action that was challengeable. You agree with that, don't you? Well, what I agree with is that in order to bring a cause of action under the Administrative Procedure Act, you have to identify a specific final agency action, a discrete agency action. Well, their complaint says funding, and I think their complaint also talks about subsequent releases, doesn't it? Well, the complaint was not limited to funding in general or one final agency funding decision in particular, and if you look at... Do you agree or disagree with counsel's statement that through amendment or additional pleadings the 2012 EA was challenged as insufficient because a full EIS should have been done? That is I believe the central claim in the case. That was litigated. Okay, so that's before us for sure. Absolutely. Your position is if you win on that, it really doesn't matter what the District Court said with respect to challenging final actions. Right, because that EA covered DOI funding, so if it's valid then DOI's funding has valid NEPA compliance. Get back to that and tell us why it is sufficient as opposed to having to issue an EIS. Right, well, I think the first important matter is to have clarity about what the action is because there's a lot of discussion in the briefing about certain extraordinary and historic actions, the removal of the Elwha and Glines Canyon dams. I'll make your job easier. Let's assume that the action is the release of these hatchery fish into the river. There was already an EIS about removing the dam back in the 1990s. And so it seems to me what they're saying as I read their briefing, and maybe I'm being unfair to them, is that what we're really worried about is you're releasing these fish into the river and they're going to damage the native populations. So assume that's the action. So was the FONSI arbitrary and capricious because the agency couldn't properly find no significant impact as to the release of hatchery fish? And that's one way of putting the question. Right, the FONSI was reasonable because NOAA's action, the finding that the hatchery plans meet the requirements for a regulatory exemption from take under the ESA had no significant impact. That is the narrow action. And it's important given the number of documents to be clear about which NEPA analysis applies to which action. So in 1995, the Lead Agency for Elwha Restoration did an EIS on the decision whether to remove the dams. And then it mentions the hatcheries but it doesn't go into detail about the effects of them. Well then there was a second EIS in 1996, the Implementation EIS where NPS said how are we going to go about implementing this decision to remove the dams? And in that EIS there is no question at all that the Park Service said one thing we're going to do is we're going to use hatchery supplementation as a mitigation measure to protect the Elwha fish stocks from sedimentation and to accelerate recovery. But it said that in a, I think what you'd have to concede was a rather general fashion. It didn't say and we're going to fund hatcheries and release certain amounts and other stuff. All the stuff that the eventual FONSI addresses. So there's got to be some point along the way do you have to, is it your position that they had to attack the EIS, the second EIS and that anything that occurred thereafter was not a, not an action subject to NEPA compliance? No, most definitely the limit 6 approval and the associated EA are perfectly legitimate actions for legal challenge. One thing that I find at least a question mark in my mind is it may have no legal effect at all, but as I understood it NEPS had earlier stated that it would prepare a full EIS as it perhaps in 2011 or thereabouts and then didn't instead prepared the EA. Does that make any difference? No, Your Honor, and what happened was this in 2004 proponents of Puget Sound hatcheries not just the Elwha hatcheries that issue here but all over the Puget Sound region submitted regional management plans for a variety of hatcheries and they wanted a single NEPA document to cover all those hatcheries. That was how the proponents of those plans, which is not NEMS, it's the state and the relevant tribes that's how they wanted to proceed. Later on down the road the proponents of the Elwha hatchery programs updated and finalized and submitted to NEMS for approval the hatchery plans at issue in this case which are uniquely tied to Elwha River restoration and for that NOAA never said, NEMS never said at one point they were going to do an EIS and later changed to an EA. So for the evaluation of these five Elwha plans, NEMS has always been consistent that an EA is appropriate. Could you address the argument Opposing Council makes that it wasn't reasonable to take as the baseline the existing operation of the hatcheries because the federal agency had never taken a hard look at hatchery operation in this area? I would have two responses to that. One is I don't think that argument is being pursued on appeal and the second point is this. In the environmental assessment 2012, NEMS included an alternative of no hatcheries. It said alternative two is the preferred alternative. We're going to approve these HGMPs. Alternative three, we're going to put a firm deadline on when the hatchery supplementation stops. And alternative four, we're going to assume no hatcheries. So that provided decision makers with a comparison of the risks, a comparison of the risks, and a comparison of the  what we're going to do for informed decision making. What do we do with, let me call them the two EAs. I know sometimes it's called the supplement. But the district court ruled on the validity, the legality of the first one, found a problem, and then a second one followed. And I don't see the district court addressing the second one other than to say it moots the claims against the tribe. Does somebody have to look at the validity of the second one? Your opponent doesn't seem to have a problem with it if the first one was okay. But I'm just, it's a strange procedural. It is a strange procedural posture. And the argument is maybe presenting itself, are all these claims moot now that superseding documents have been issued? I'm not sure if that's where you're at. Well, that's where I'm heading, and I'm wondering whether anybody has looked at that claim before it comes to us. No one has looked at the validity of the superseding environmental assessment, biological opinion, and Limit 6 approval that were completed. And no one has looked factually at whether there is or is not compliance with Limit 6 requirements and the specific things that are supposed to be done to comply with the plan. Okay, right. So on that claim, which is directed against the tribe and not against the federal defendants, in my view, the most compelling argument is the 60-day notice argument. In order to bring a claim under the ESA citizen suit provision against anybody, you have to provide 60 days notice of the alleged violation. And the notice has to provide the recipient with enough information for the recipient to try to correct the violation and avoid a lawsuit. That's the whole purpose. And the claim here, I take it, was there is no valid plan, and therefore what you're doing is not in conformance with the plan. Exactly. The first notice was, you're taking listed species and you have no coverage. Well, the tribe did what any reasonable entity would do. It went out and did everything we asked them to do and got coverage. That totally changed the legal landscape once NIMS issued that coverage. So how do we know that now with the superseding documents, if you will, there is coverage? Or is it your position that they've never really made that claim? Well, I think... How could they make it until the documents came out? Right. And at that point, you owe the tribe a reason why you believe that they are not complying with the recently issued plan because otherwise they can't attempt to abate the violation. And that's why the district court correctly ruled that in order to proceed the claim that Judge Graber... Except isn't it an affirmative defense? Isn't it enough to say you're taking fish and they have to come forward with proving up an affirmative defense? Well, I think regardless of whether it has to be pled as an affirmative defense, the fact is it fundamentally changed the landscape. And if you think, if your former claim was, you don't have any tape coverage, the claim that you're not meeting the requirements of the new approval is a different claim. So they said you're taking fish without a permit. And then the defendants got a permit. Right. And you're saying they need a new 60-day claim to... 60-day pre-suit... Pre-suit claim in order to put the tribe on notice that there's a new argument. So the new argument is the new claim would be, in your view, you're not complying with the permit that you now have. Right. And that claim was not made. Right. Presumably the notice would contain a reason why the sender thinks that the tribe's not complying so that the tribe can try to abate the violation. But that's not really mootness, is it? No, that's because the 60-day notice requirement is jurisdictional. It's a jurisdictional prerequisite under the Southwest Center case and a long line of cases. So I think going back to the question of whether the EA, the 2012 EA, that's the center of the lawsuit, is valid. Obviously our position is there's no question that it is. But I think it's important to stay focused on what the action is. And that's the point of the tiering arguments that you see in our brief. Could I just ask one more question about the 2014 supplement? Is that really irrelevant to us because the argument of opposing counsel is there should have been an EIS not an EA and the district court said EA is fine but your EA is defective and then you've purported to fix that defect and they're not challenging that. So is that irrelevant to us or how do we address that? Right. Let me clarify that. Even though the issuance of these superseding documents raises the specter of mootness, we have not argued that because they're saying you should have had an EIS in the first place. Right. And we have not said that claim is moot. But what is moot is the question of whether the district court should have done something more on remand. That's how those documents... Because you think this moots in effect the district court's ruling that they were challenging the wrong plan. No. The district court found an error in the plan, in the EA, the 2012 EA, ordered us to correct it. I'm sorry. We're talking about two different things. You do think that we need not consider whether or not the district court correctly ruled that the plan wasn't, that the resource management plan wasn't a final agency action because surely there was some final agency action that occurred between then and the issuance of the EA and you say the EA correctly complies with NEPA with respect to that action. I think you don't have to reach the question of whether the court district... Can I get back to your tiering question now, your tiering point? Sure. There's an EIS way back in the 90s. I remember the 90s. And it says part of our plan is going to be have hatcheries and release fish into the river. And I assume there's, that means that if you're just going to attack that concept that's already dead. But surely they can attack the specifics of how it's going to be implemented, can't they? That's correct. The decision to use hatchery fish instead of just allowing nature to take... Right. Was made in the 1990s. That was made in a 1996 record of decision. The time has come and gone for challenging that. What we have here is... Is how many fish and when and where. The specifics of these hatchery plans and most assuredly those were timely challenged in this case. And we don't, our position is that the fishery service's finding of no significant impact was reasonable. And I see that I'm cutting into Mr. Albright's time. I was looking to see if he was nervous yet. So unless the court has any questions, the district court's... I'm sure we have many, but I think we'll hear from Mr. Albright. Thank you. Thank you. Good morning, Your Honor. Your Honors. Corey J. Albright on behalf of the defendant officials of Lower Elwha-Klallam Tribe. As counsel discussed, plaintiff's claim against the tribal defendants was premised on the lack of an exemption from the take prohibition. An HGMP approved is not a permit. It's an exemption from the take prohibition. They told the district court that to redress their injury, what they would like was an injunction to enjoin the hatcheries until such time as NIMPS exempted the hatchery programs from the take prohibition. And then in plaintiff's words, that would authorize any take. That's exactly what happened in December of 2012. Well, it doesn't authorize any take. It authorizes take under conditions, correct? It authorizes the take that is in the approved HGMPs. And if I could, Judge Braber... But it's not unlimited. It's not you can do anything you want, is it? No, of course not. It's within the scope of the analysis. So, even though there is now an exemption, there may be some take that is within it and some that isn't, at least in theory, correct? It's undisputed in this case. Answer the question first before you tell me what's undisputed. In theory, it's possible that a take would exceed what is allowed under the exemption. That is correct, Your Honor. So, why isn't that an appropriate subject of inquiry in this case? The government's lawyer says it's because there's a jurisdictional defect. Is that your position as well? That's not the claim that was noticed and brought. So, the answer to Judge Braber's question is yes, you believe there's a jurisdictional defect that would prevent... Absolutely. ...the district court from considering whether or not you're in current compliance with... And I'd like to distinguish between mootness, which is obviously constitutional and an agency can't overwrite mootness with a regulation, and an affirmative defense. In the context of this case, the claim that was pled in the six-day letter, which, by the way, that six-day letter did not even mention the four programs that are approved. It was a very general, generic complaint about hatcheries. Once the take was authorized and there was nothing to enjoin, that's a mootness question, and there was no effective relief, which plaintiffs... Was there a subsequent notice or action on the part of plaintiffs that would have permitted the court to take a look at the question whether the client... That happened, Your Honors, in July of 2014, 17 months after the dismissal, plaintiffs sent a six-day notice letter to the tribe, and that's referenced in the supplemental excerpts... Okay, so what's wrong with that? They didn't bring a claim. The United States and the tribe responded in detail, and the letter is in the supplemental excerpts, the U.S. letter beginning at 40, and explained why, in fact, the specific allegations that plaintiffs had of noncompliance were incorrect. And then they could have brought a claim after that? They absolutely could have brought a claim at that point, and they chose not to. Why? Because the explanation was thorough, and it was detailed, and it addressed each and every one of their concerns. We don't know. The why doesn't matter, does it, if it's jurisdictional? Absolutely, Your Honor. Because maybe they didn't bring it because they didn't have enough money to challenge it. I don't know why. They had an opportunity to bring that claim. They did not do it. So, if I can just ask, if I'm understanding correctly, you're saying that the claim that the tribe's hatchery operations are not complying with the HGMP were not included in this suit. Is that correct? That is correct. There is nothing specific in their original 60-day letter about any of the tribe's programs. There's no history of problems with those programs. There's nothing in that notice that would put the tribe on notice that there was anything that it could do besides get a take exemption for their programs, which is what they did. And I take it if tomorrow the plaintiffs thought you weren't complying, they could file a new 60-day letter and then proceed from there. Absolutely. And with the 60-day letter in July 2014, if they had filed a case and not accepted the explanation of the tribe in the U.S., then we would have raised an affirmative defense as contemplated by the rule. We have authority approval in place and we're complying with it, which is exactly what we explained to them in our response letter and so did the U.S. And they chose not to bring that claim. Thank you, Counsel. Thank you very much, Your Honors. I'll give you two minutes for rebuttal. Thank you. I want to pick up where we left off here. It is not a violation of the Endangered Species Act to disregard the terms and conditions of the 4D approval or the unincidental take statement. It's only a violation to cause take under Section 9 of the Endangered Species Act. This was made clear by the Supreme Court in Bennett v. Speer that a defendant remains liable to Section 9. The notice provision requires that we give notice of the violation. It is not a violation to disregard the requirements of their approvals. Instead, those are affirmative defenses. But isn't the whole purpose of the notice, at least one of the purposes of the notice, is to give the party that you think is doing something wrong the opportunity to fix it? The Supreme Court has interpreted the notice requirements under the Clean Water Act to imply as much. So you say to the tribe and to the federal defendants, there's a problem here. They're taking fish. They're making incidental taking of fish. And there is no federal authorization to do so. Forgot which of the various documents does that. And they say, by God, you're right. Let's go to the federal government and get one. And they get one. Isn't it a very different claim to say, now that you have one, you're not complying with it? Because if you tell them that, and you tell them the way they're not complying, perhaps they change their ways to comply with it. It strikes me as two very different claims. Our claim is the same. Our claim is, take. Their defenses are different. They now have an affirmative defense where they need to establish that they're in full compliance with the terms and conditions. So the defense has certainly changed. But what is your response to their argument that you could just send another letter now, and that would satisfy the jurisdictional requirement, and have at it? And that you did send a letter, in fact. That sort of rule would really undermine the effectiveness of citizen suits like this. And that's why this court has twice held the first time in Natural Resources Defense Council versus Southwest Marine, and then in Water Keepers, that subject matter jurisdiction is established by providing notice adequate on the day that it is given. And so sure, we said when we gave notice that there is no authorization whatsoever, but those cases hold that we're not required to provide subsequent notice for the court to retain jurisdiction based on defendants post-compliant. But here, what we have is, you complain about something. It gets fixed. What you complained about got fixed. You said there's no authorization. They got authorization. The district court says, okay, I guess I'm done. You got another complaint, and it's not anywhere in front of the court. Is the court supposed to then say, well, no, there must be another complaint that I haven't heard about before? But again, we did supplement our claims to plead that there's noncompliance. When did you supplement them? Shortly after the Limit 6 approvals were issued. I can point the court to the docket. I don't have it at my fingertips. But before the district court ruled? That's correct. And in response to that supplementation, did the defendants argue that the court lacked jurisdiction to consider them? The actual supplementation was not opposed by the Hatchery defendants at all. Do you have to present any evidence that they're not in compliance? It's an affirmative defense that the defendants need to establish. In other words, you can just make an accusation, and then they have to come forward with evidence that they're in compliance? The only violation is take, in violation of section... That's my problem here. Your first allegation of illegal take was because they didn't have... I know it's not a permit, but they didn't have a permit. Then you supplement. What do you base your supplement on that they're not taking in conformance with the existing plan? Well, again, the defendants, they didn't allow even opportunity to discuss whether or not they were complying with the implementation terms. They immediately moved to dismiss without any... But I'm asking, is it just enough for you to say I allege the... I've supplemented my notice. And I supplement my notice just to say you're not in compliance with the plan. Don't say any reason why or anything else. Is that sufficient to trigger to them the burden of showing compliance? The way I... The regulation defines the legal effect of the 4D rule, and it defines it as affirmative defense that they must plead and prove. So all you have to... It's like the prima facie case, essentially, is you're taking fish. Correct. And then it's up to the defendants to say yes, but we have an affirmative defense. We're taking fish, but we're allowed to because we're in compliance with the exemption. Correct. And they moved to dismiss before there was even opportunity to discuss or evaluate whether or not there was compliance with those... Let's assume that the judge erred in that respect, just for purposes of discussion. What are we to do with the fact that you then file a subsequent notice raising precisely that issue? They respond and you don't go forward with it. I mean, what... Haven't you been given every opportunity to cure every error and decided that you didn't want to? We believe it's abundantly clear that the district court erred in dismissing the take plan. I've asked you to assume the district court erred. My question is what's the effect of the fact that you subsequently brought a notice and then never proceeded on it? I'm not sure there is any legal effect. We decided not to pursue it because we're confident that the district court erred in dismissing the claim based on... You're saying it was duplicative, essentially, your second notice. It was protective. We were evaluating litigation contingencies and it was overly protective. Okay. Thank you, counsel. The case just argued is submitted and, speaking at least for myself, I found the arguments extremely helpful in this the comments from all of you. She's speaking for me, too. With that, we are adjourned.
judges: Graber, Ikuta, Hurwitz